Good morning, and may it please the Court. Adam Schulman for Objector-Appellant, Anna St. John, and I'd like to reserve six minutes for rebuttal. In COBE v. ARS National Services, this Court held that merely obligating a defendant to do what it was already doing is of no real value to a class. Per the rule of COBE, in exchange for such worthless relief, class members cannot be asked to give up anything at all. This settlement is worse than COBE. Instead of obligating Facebook to keep in place its amended data handling practices and policies, which they changed in 2015, the data policy, this settlement merely describes certain changes that Facebook made in the past, mostly implemented even before the inception of the case. That's not true as to the 22-word disclosure, right? That is the only incremental relief, if you could call it that, beyond what had happened before the settlement. And we think that in analyzing that, you have to look at two components, right? You have to look at the materiality of those 22 words. We use tools to identify and store links shared in messages, including a count of the number of times links are shared. That's it. So you analyze the materiality of that versus what was already disclosed in the data policy. The data policy is linked from any time somebody signs up for Facebook. There's a terms of service. That links to the data policy. But there's sort of an inconsistency in your logic, I think, because you're saying the data policy already exists, but it's not valuable because they could change it, but the 22 words are just repetitive of it. So the 22 words, even though they can't be changed in this agreement, are just repetitive of this thing that can be changed. It feels like you're kind of trying to have it both ways. Right. For one year, they have to maintain those 22 words on an unspecified page on their help center that will be visited by less than one in 7,000 class members, by less than 1 percent of the class, whereas the data policy is made available to the entire class, right? So that, we think, is a matter of common sense. In fact, in our reply brief, we get into this argument more, that, in fact, by the language of that disclosure, it doesn't track the language of the complaint at all. If you look at the Second Amendment complaint, it's all about interception. It's about scanning and about crawling of the content of those links. The identifying in store doesn't say anything about reviewing content, let alone. Why not? Identifying the links, isn't that finding them and noticing them? I mean, that doesn't actually sound that different to me. Well, I view, like, identify to be you're counting, here's link A, here's link B, right? It's necessary to count to identify them. But I thought, like, the thing you're objecting to in the complaint, or the plaintiffs were objecting to in the complaint, was that messages were being read to see what links were being included, and then the links were being counted for certain purposes, like thumbs-ups. That was one of the uses that was being objected to. The other uses was that content was being shared with third-party advertisers. So there was – but without identification, right? Without identifying. Without identifying who the person was, whose message it was. Correct, right. But the content was an integral part of the aspects of the complaint. The content scanning was a very important part. And they alleged at – I have the record cited – at ER 176 and 177 of their operative complaint, they specifically complained about the sharing of demographic data with third parties. Now, not only does the 22 words not address – don't mention obtaining the content, which the data policy does, the 22 words – Well, so even if it's not totally overlap – I mean, even if it doesn't cover the entirety of the data policy, it still says something. So it's still – even if it's very small in value, I mean, there's still some people who are going to go to this Q&A page. And that takes it out of COBE, right, where COBE was zero. This is 0.001, but it's not zero. No, I think by comparison to COBE, this is less. COBE got an injunction against reverting to prior practices. They didn't get an injunction here. They got an acknowledgment, right? Oh, so the 22 words you're saying is new. I think that as a matter of common sense, you have to look at – so there was a new disclosure in Drymax Pampers. There was a new disclosure put in every Subway restaurant. That didn't prevent the Seventh and Sixth Circuits from concluding as a matter of law, as a matter of common sense, that those didn't justify any – Yeah, I think those are different issues, though. I mean, your COBE argument, I think, was about did the class get any value. And I think the 22 words might be very little value, but I don't know. I'm not persuaded by your argument that it's zero. Okay. Subway is a whole different problem. Subway is like this case never should have been brought because it's so silly. So let me assume that that's correct, that there was some nominal value above zero to the language of those 22 words. The settlement has a total disinterest in informing any of the absent class members of those 22 words. It didn't even provide notice. Advertisement – What did the absent class members lose by this settlement? I mean, part of what – and I look at this and I'll concede. There are several things about this settlement that seem very peculiar to me. But as I balance that against what it is that the absent class members have given up, I don't see they've given anything up either. It's sort of like a non-event for them, even for the ones that might notice the 22 words. I mean, and the reality of what we hear from the other side is that everybody is going to consent anyway. And that may be the reality of our current world. So I look at this and say, well, this seems – I mean, frankly, this seems like an extortion scheme of some kind. But how were the absent class members hurt? They give up their share to the value of the settlement. That is the $3.9 million that Facebook was willing to pay. But they can't get money because it's not a class that's been certified for damages. And they don't give up the right to sue for damages. That's correct. They can't give up the right to sue under Wal-Mart reduce and under B-2 jurisprudence. But that doesn't mean that they can't institute a claim process for a uniform payment. I mean, that's the Cobell case that we cite in our reply brief. But the absent class members haven't given up the opportunity to pursue a damage claim. Right. But they have given up their right to pursue injunctive relief claims. And the value of those to Facebook was $4 million. They're getting none of that. Well, I'm not sure that Facebook was putting a price tag of $4 million on that. But we'll hear about that a little bit more with the appellees. I'm still focused on what have the absent class members lost. And I really don't see much of anything that they've lost. They've lost their entitlement to the settlement value of these claims. But they couldn't have gotten that money off of this class. Well, they could have. They could have sent they could have used the money either to want to provide if, again, assuming that there was some value to those words, they could have used some portion of the money to provide better notice to the class than what is on the record is that less than 1 percent of the class. Notice of the class doesn't mean very much to me if the notice wouldn't have value because the members aren't giving anything up. I'm still stuck on that point. And it's important to me because if the absent class members haven't lost anything, it gets hard for me to care about how this is abusive to them. It may be. I don't like the fact that Plaintiff's Counsel manages to extract up to $4 million through this. And we'll be hearing more about that. But I still don't see how it injures the absent class members if that wasn't on offer to them in the first place and never would have been through this class. They haven't given up damage claims. If there are viable damage claims, they could still bring them. But they didn't and haven't. Right. They've given up their injunctive claims through the effective date covering all the claims presented in the complaint, right? There was nothing that was precluding the name claims from settling this on their individual basis. And then we wouldn't be here today, right? Because they have given up something. But so part of the problem I'm having and maybe the same question that Judge Clifton is asking is, yes, they've settled their injunctive relief claims here. But if we think the injunctive relief claims were very weak, like these claims should never have survived. Let's just take that as a premise for a second. You probably disagree. But say these claims were just going to lose. Then is there any harm to the class for the settlement? There is. And I think you can look at COBE to see that this is. Because COBE speaks directly, explicitly about giving up anything in return. It uses that at two points in the opinion. It says that in COBE there was a dispute of fact about what the waiver of. So in COBE they released class-wide damages claims, right? And it mattered because there was another class action going on that was going to be stopped because of that action. But. And I mean the court, I was on the panel, assumed that that had value. I mean I think, I don't know how you read COBE without assuming that that was a problem. What COBE did was it said there's a dispute here. The defendant in COBE said that these class-wide claims are only worth $35,000 because that was the 1% cap under the FDCPA. And the plaintiff said, no, you could bring it in multiple iterations and it wouldn't necessarily be limited to that. But the court didn't say. But either way. Even assuming that the defendant was right, that $35,000 is of some value. How could an injunctive claims on behalf of potentially 100 million members be worth less than $35,000? I think it shows that. Well, I mean, they could be. Well, it seems like they could be. If the claim didn't have merit, it's probably worth zero. And I think that's what the court was getting at in subway. I mean, if you bring a case that is just so silly because it's like you've got the same amount of bread, whether it's almost a foot or a little more than a foot, as long as it weighs the same, it's the same amount of bread. And so why did you bring this lawsuit? It's sort of like, if you think that that's what this is like, it's like, who was ever injured by an anonymous count of links? Then who cares if it's given up? Well, the subway court didn't say that. It said that the representatives weren't adequately representing the class because they weren't striving to get a real benefit, which is, I think, exactly what's happening here. Subway only had an injunctive release. Didn't go to damages at all. There wasn't even a class-wide waiver of damages in subway. Yet they found that the representation was inadequate because they had not strived for a benefit for absent class members. Rather, they strived to capture the entirety of the settlement. And that was only $500,000 in fees for the representatives and class counsel. This is $4 million. It's a significant amount of money that the class is being deprived of. Now, whether Judge Clifton is right and in a B-2 you can't find any way to get them actual direct distribution, you could have still done cypre under this Court's jurisprudence. You could have still done it, and you needed to do actual notice under Rule 23E and Rule 23H. Those are utterly absent from the settlement. I think— If you are right, how would—and you assert that the standard review is abusive discretion. How would you argue that if you were right, that was an abusive discretion on the part of the district court? For making errors of law in a number of respects. The idea that no notice was required beyond a posting on the law firm's websites— Was that before the district judge? It was before the district judge. A ruling was made. The ruling was made that that was sufficient notice. And I think as a matter of law, that cannot be correct, that that constitutes sufficient notice. That isn't even a cognizable form of notice, right? Notice is publication or direct or, you know, posting on— And this Court has said in B—and they argued before the district court. They argued a number of things. First, they said in B-2 settlements, you don't need notice at all. That is completely inconsistent with this Court's decisions in Manduhano. I think your point is well taken. The argument that you're making is one that's troubled me. It looked like there was no actual client out there. The attorney got an event and then got out and got a client, two personal friends. Correct. And the personal friends were paid money. The personal friends were the ones who were going to check on the lawyer under our rules. What was shown that those personal friends had an adverse interest such that they would check on what the lawyer does in relationship to this $4 million or whatever it is? You're right, Your Honor. Facebook raised that as an argument against class certification, and the district court rejected it. It said that the personal friendship didn't rise to the level of a conflict that warranted not certifying the class. Though, again, in light of the terms of the settlement that came later, the court would have had an obligation to review its earlier class certification. And if I understand correctly, if you take any of the lawyers' fees, they go to the friends. Under how the settlement is structured, I think they would revert to Facebook. Oh, would they? They would revert to Facebook. Like they reverted to the friends. Right. Facebook agreed to put up that amount of money, not oppose it, and anything less would go back to Facebook, which is a warning sign of an unfair settlement under this court's Bluetooth decision. So I really do think to take back to the original question, you're looking at these 22 words. There's two components, the materiality component and then just being material isn't enough if you're not putting it before any percentage of the class, right? So there's record evidence that less than 1 percent of class members are going to, at most, you know, at most less than 1, well, it's going to be less than 1 percent, of class members will actually visit the relevant web page during the time of the injunction. A smaller number will actually see the words. So earlier, when Judge Clifton asked you what the class has given up, you talked about releasing the claims at issue in this complaint. Are you pressing an argument that they actually released even more than that? The text of the release refers to claims asserted in the litigation. I can read it to you. From ER 13637, upon the effective date the releasing parties will be deemed to have, and by operation of the final order and final judgment, fully, finally, and forever released, all past, present, and future claims, yada, yada, existing or preexisting, recognized now or hereafter, it's as broad as possible, but that result from, arise out of, or are based on, or any way, in any, relate in any way to the practices and claims that were alleged in or could have been alleged in the action, which is the entire action. So you are saying that the problem here is they released these claims? Well, if there was no real, if it was just an individual release, then we don't even believe we would have standing to be here to challenge. But you think the class released these claims, and your argument is not based on the idea that some other lawsuit that people might want to bring against Facebook is going to have a problem because of this release? I think so. I think they could. I think there's an arguable, Facebook could arguably read this to preclude lots of suits that include injunctive relief arising out of its scanning practices. Now, whether they've done that, I don't know that they have or haven't. It's a matter of public record and other courts. I know that several, many suits are getting filed. We filed a motion for judicial notice that was denied about an MDL that could theoretically cover these claims. So maybe the new plaintiffs will win on the idea that they're not precluded because this doesn't cover the same predicate, right? But there's certainly an argument from Facebook that it would preclude claims. Do you want to reserve the remainder of your time? Yes, I would love to. Good morning, Your Honors. May it please the Court, my name is Hank Bates. I'm with Carney, Bates & Pulliam. I'm here on behalf of Matthew Campbell, Michael Hurley, and the B2 class that was certified by Chief Judge Hamilton. The question before the Court is whether the objector has met her burden of demonstrating a strong showing that Judge Hamilton abused her discretion in finding the settlement, in approving the settlement. And more specifically, the question is whether she comprehensively explored the Hanlon v. Chrysler factors and gave specific attention to each objection. And she did. She gave a, she was, this was a very mature case. She was deep in the facts, deep in the law at the time that she made her decision. She examined every Hanlon factor. What are the benefits to the class members? There's multiple benefits to the class members. In terms of what we got in the settlement, I think Judge Hamilton said it best, that the class has obtained essentially all of the declaratory and injunctive relief. First, what she describes as declaratory relief, is that declaratory relief? There is no declaration by the Court at all. It's a recitation of what the settlement purports to provide. But there's no, nothing there that would prevent Facebook from taking all of that back instantly. I think what she meant by that we obtained. It's not declaratory relief. I would agree with that. Okay. So what did the class get that's enforceable at all? And the best I can discern is for one year, the additional 22 words. I see nothing else that flows to the class. Can you tell me if there's something else? Am I wrong? In terms of the benefits to the class, there's multiple benefits. One, Facebook stopped the challenge practices. There were three challenge practices. Well, but they're not bound to that by anything here. There's been no change in the legal relationship with the parties. They could undo all of that if they wanted to. So I don't see that as a benefit to the class. You may assert it. I don't buy it. What else do you got? Well, can I address that, though? Sure. In terms of, when they changed the practices, they also changed the architecture, the sense that they're going to go back and move. Within this space, the practical matter is the architecture keeps changing but moving forward. There was very little concern they were going to move backwards in terms of the change. But hadn't some of that happened before the case was even brought? Two of the three practices challenged had stopped before. One stopped afterward. The second thing that is important. Well, hard to attribute that as a benefit to the class if it had already happened. The second thing that was important, because you have to remember, in terms of both the context of our statutes, ECPA and CIPA, both of these statutes prohibit the capturing or intercepting of content without consent. Maybe benefit from the statute. Hard to see how that's a benefit from the settlement. I was getting to that. Judge Hamilton, in the motion to dismiss, rejected that the arguments that Facebook made that they had obtained consent with the current terms of service and the lawsuit effectuated a change in the terms of service. So the second thing that the class got was notification disclosure in the terms of services that indeed Facebook was intercepting and capturing content. That's the data policy. That's the terms of service. And then there's the data policy. And the second aspect of that's the language that they're added to the help page. The other thing that is critically important in the settlement is in the settlement itself. It clearly describes for the first time these three practices that Facebook was doing and sets out in detail those practices. And although we did not get a B3 class for monetary damages, so therefore this case was not about monetary damages. Of course, monetary damages are outside the relief and, most importantly, outside the release. However, the details in that settlement agreement provide a yellow brick road of anyone else who wants to follow behind it. I don't see how, though. So the acknowledgment regarding cessation of practices doesn't talk about anything personally identifiable. And when it's not personally identifiable, I just have a really hard time figuring out how anyone's ever going to have a good claim where they have standing and they were injured when nothing about them was disclosed. It's the end shares that talks about personally identifying. And there, as I read it, they don't admit that they ever did it. I mean, in terms of there's multiple aspects in terms of the injury. And you have to look at each one of the practices. In terms of the demographic data that was shared in the Insights Dashboard, it might not be personally identifiable. But someone's message, content, their speech is being used for commercial purposes in a manner that they did not give consent to. And in this context, it could be very critical. One of our clients, Matthew Campbell, for example, is a political blogger. He could be including links and private messages to people about politicians he dislikes, not liking them. And then when that content is used for commercial purposes that creates the perception that that politician is getting more likes, his speech is being misused. He's no longer having autonomy over his messages. And that's at the core of what these cases go about. That's why they are important. On one hand, yes, they're very technical. I think many of the issues that are going about in our newspapers, congressional hearings are highly, highly technical. So it seems like that argument about Mr. Campbell depends on the idea that he would have thought Facebook wasn't going to see the things he typed on Facebook. Correct. And wasn't it clear that they did even before the class period? No, Your Honor. And that's, in fact, what happened at the motion to dismiss stage where Judge Hamilton ruled that it was not clear that there was no consent for the capturing and use of the information. And it wasn't just understood that that was Facebook's business model? Correct. She ruled the opposite. So when did it become public knowledge? It seems like it is now. So when did this happen? It seems like it was obvious then, too, but it's a little hard to go back in time. The terms of service has changed in, I think it's, here, I've got a note. Yeah, January 2015, after the adverse ruling to Facebook in the motion to dismiss when their argument that there was consent was rejected. And you don't think we can ask what was known in the world, in the news, in understanding in the public about what it meant to use Facebook? Well, Your Honor, we're getting beyond the briefing at this point, but that came up at the class certification stage as part of the arguments of commonality. And, in fact, we won on the B3 issue before Judge Hamilton at that time. She found that there had been some, even though there had been a few, very few newspaper articles or blog-type things, that there was not knowledge of that. And we actually won on the B3. We won on all the B3 components except for the damages component. Can I address? Does that answer your question? Yeah. And I know I've gotten off your question in terms of all the relief. I haven't been persuaded to much benefit, but tell us what you want to. I'd like to ask you what you think about what was released here, because I am concerned that what was released is broader than the claims at issue in this case. And so what I'm wondering is, if someone wants, someone in this class wants to bring an injunctive relief claim now, saying I no longer trust Facebook, I want Facebook to delete all data they've ever had about me, and a class that says they all want that, is that barred by this because it's about the data policy, the same kind of data policies, and it would be a claim for injunctive relief? It would just be a different claim for injunctive relief? Well, there's three issues here. One, obviously no damages claims were released. Right. So I want injunctive relief. Destroy all our data. We want to be erased from Facebook. That's the claim for injunctive relief that they want. And no ongoing practices are released, because a release cannot as a matter of law, nor does this one, release future. But what if they're asking for, I want you to delete my data from 2015. I don't want you to keep it. Delete data in what, within that context, if what you're asking for is for deletion of data in the past related to. . . Related to everything. I want to be erased from Facebook. That's their claim. Oh, all we've released is you go to the identical factual predicate test, and you also go to the language of both the order and the settlement, and it's limited to the confines of what could be brought in the complaint, which is the three challenge practices. But it says. . . So we're down to. . . Relative. . . It could have been alleged. Things that are recognized now or hereafter. I mean, it's not really limited to these claims. And so I am worried about whether plaintiffs might have a problem saying, now there's news release that Facebook is actually keeping personalized, personally identifiable information. That was not clear here. It was not an assumption of this case. But we waived all our injunctive relief, and now we can't bring the case about getting rid of our personally identifiable stuff. How have you not hurt these plaintiffs that way? There's. . . One, it's not going to. . . I'm about to run out of time. I said these plaintiffs, but I mean this class. This class, yes. One, you go to the specific release itself. It is to the confines of what could be brought in the complaint. And Judge Hamilton made very clear that the complaint and the Second Amendment complaint, if you go back to her orders, had to be confined to these three practices. And the final three discovery orders, when Judge Hamilton took discovery back over, she reiterated that. One of the problems is that the release paragraph, I used to practice law, I used to write it as big as you possibly could. There's 17 words that say the same thing. And we get, I mean, the result from a rise out of or based on or relate in any way to the practices and claims that were alleged in or could have been alleged in the action. Now, it may be that Judge Hamilton has an idea of what that might be. But I'm afraid about some judge in Illinois someplace looking at this and said, well, this claim could have been alleged there. So you're barred here. Now, the release itself doesn't articulate a limitation that prevents the kind of concern that Judge Friedland has identified. Well, there's two limitations. One, it does say that could have been brought in the complaint, and Judge Hamilton made very clear what could have been brought in the complaint. But the release doesn't. And the judge in Illinois may not know what Judge Hamilton thought. The release does in the sense, well, if it comes, she can look back to what Hamilton wrote because it's in the record in multiple stages. Secondly, you go to the identical factual predicate test that the Ninth Circuit applies, and it would have to be identical factual predicates. These three specific uses related URLs in message content during this time period. So, wait, you're saying, maybe I'm just not familiar with the case you're relying on there, but you're saying a release can't release more than the claims in a case? It seems like it could if it contractually does. If there's a case that says you can't, then I'd like to know what it is. I'm sorry. I spoke over you. I was just saying, if there's a case that says you can't contractually release more than the claims in a complaint, I'd like to be pointed to it because I'm just not aware of it. Two, contractually, we limited it to the complaint. And secondly — But it says that could have been alleged in this action. That clearly is not what's in this action because it's what could have been alleged in this action. That's where the identical factual predicate test comes in. It would have to be to the exact same identical factual predicates. It would be down to this very narrow — So it might be a factual predicate of reading and storing what people are saying, and the additional piece might be it's personally identifiable, but a lot of it would be the same predicate. Under the case law, it would have to be down to the facts of the URL content related — This is not an issue that was raised in the briefing, so — That's true. You can tell us later. Well, I think I have a case. The Hess v. Sprint Corporation, 598F3RD581, sets out the identical factual predicate test and specifically says what I've been discussing. And what it really comes down to is where folks have run into a problem is when they're trying to bring, for example, under these — They want to bring a new cause of action related to these same facts. That's what would be released. But if it's a different use, if it's something else happening in private message capturing other than URL content, et cetera, that's outside the identical factual predicate and I believe also outside the language in the release, if you look at that specifically. But again, these are — this is not a claim that was preserved for appeal nor in the briefing, so it's not properly before the court. If I can squeeze in, your adversary indicated a challenge that Cyprey was not considered. With the amount of involvement here of attorneys, it sounded like a big case. Was Cyprey considered as a possibility of the settlement? No, Your Honor. Cyprey would bring money into the case, and if you bring money on the side of the release — But it would punish Facebook. That's what it does. And then you give it to some university or something. But he mentioned it, and I wondered whether or not it had come up in the case itself. From our perspective, we did not want Cyprey to come up. Because if Cyprey comes up on the relief side, it's going to come up on the release side. And we did not represent a class for monetary claims. We wanted to preserve their individual monetary claims, and it would have been very difficult to do that because if we brought up money on the relief side, Facebook would want money on the release side, which is what you see in the Cyprey cases. So somebody can bring a Cyprey case now? Not for separate relief under the same claims for the same factual predicate. They could, whoever they are. I'm way over my time. I'm sorry I'm answering questions. We had a lot of questions. You did the right thing answering the questions. Thank you. Judge Wallace, if I can begin there. The short answer to your question is yes, they could bring that case. Because Cyprey is a form of monetary relief. That would be the B-3 claim that was actually rejected by Judge Hamilton, and that is not released pursuant to the settlement. To answer your other question, the parties did discuss that, but it was quickly rejected because, again, the dynamic here was we had a certified B-2 class, not a B-3 class, and we would submit, especially with this issue pending before our Supreme Court, that adding Cyprey to the mix, frankly, would have drawn additional objections. Appellant's counsel is actually counsel in that case and is arguing that Cyprey is inappropriate. So, frankly, it was never really a realistic discussion, and I can represent to this court that if someone wanted to bring that claim, and it was timely. I have to make that caveat as well. We've had a lot of intervening authorities since this appeal has been pending. They could bring that, and it is not extinguished. I'd also like to address the judge's concerns regarding the release in this case. And the decision that my plaintiff's counsel just addressed, Hesse v. Sprint, I think answers the question. It's a decision authored by Judge Clifton, 598 F. 3rd 581. Do you believe anything he says? It must be a good case. I was going to say a very esteemed judge of this court actually decided this issue. And if I could just start to frame this issue in terms of what we're actually dealing with in this case. This case is not about everybody who used Facebook. This case is not about everybody who used Facebook and sent a message via Facebook's platform. This case is not even everyone who used Facebook who sent a message that contained a URL. Rather, this case is a very narrow subset of each of those groups. It is those people who used Facebook, sent a Facebook message that contained a URL, and from which Facebook generated a URL attachment. And the reason we know that is because we had three years of very intense litigation, 27,000 pages of documents, intense technical discovery, the likes of which my client hasn't been subjected to before or since, 19 days of depositions, about a dozen discovery motions to the magistrate judge and to Chief Judge Hamilton, at a certain point took over discovery because she wanted to make sure it was grounded in the specific practices that are at issue. So that's to frame the actual claims that were brought or that could have been brought. And that's critically important if you're analyzing the release. Going back to HESI versus Sprint, the context in which that dispute arose, the facts of that case involved sales of cell phones by Sprint, and there were certain taxes. So you remember, it's not like this anymore, but when you would buy a cell phone, it was often subsidized by the carrier. It was free. But plaintiffs or customers would actually pay the tax on the full retail value of the phone. There was a lawsuit that this wasn't disclosed, that it was inappropriate. The underlying settlement with Sprint actually involved claims that there were federal taxes, and the release in that case was the similar release you have here that you see in all of these settlements, a very broad claims that were brought or could have been brought, turned to HESI. HESI then comes in and says, that doesn't extinguish my claims because I'm actually suing under state law taxes. And all that was litigated in that other case was federal law taxes. And this court held, to bad Sprint, you cannot use the first settlement, which involved only federal taxes, to extinguish the second lawsuit. You had a very, very close relationship between the two, but that is what we would respectfully submit. That is the context in which any dispute over the scope of this release would occur. We would submit it's not a reason not to affirm Judge Hamilton's discretionary decision to approve this settlement, but it would be a restriction on any attempt by my client, Facebook, in another lawsuit to try to broaden the scope of that release and say it's broader than it is. I can't answer, for example, the example that plaintiffs or, excuse me, that objectors counsel cited is an ongoing MDL involving Facebook. If there are claims in that case that involve URL shares and messages, then yes, it would be covered by this. But other items would not be. And we would be faced with this argument under HESI versus Sprint were we to try to argue otherwise. But that's, again, we would submit, that's the context. But what about a case where some, where, okay, so it's the people who have links, and then Facebook saves something about those links. They want everything about their prior use of links to be deleted from Facebook's memory. And I heard Your Honor's hypothetical. You actually can do that on Facebook. There's actually a system by which you can go in. So that, we would hope that wouldn't even descend into a lawsuit. But if that were the lawsuit, and let's hypothesize, as I think you are, that it's only injunctive relief, again, it would depend on the specific allegations. If there were claims that it violated the Wiretap Act or it violated the UCL, but if it were just a pure, let's say, you know, privacy action in which they were trying to have those links deleted and for whatever reason Facebook rejected it, and it involved the specific links and messages, then that would be the analysis that that future district judge would have to undertake. We would argue in that instance that claim would face very high hurdles on the pleadings. But, again, if it went beyond that, for example, your hypothetical would encompass, you know, posts on someone's Facebook wall, not just URLs and not just messages. That would be totally different. And, again, we would have a very difficult time, I think, arguing that the settlement and the release in this case under Hesse v. Sprint somehow bars that future action. There's one issue that bothers me, and I wish you would respond to it, which I'm sure you will. In the usual case, the person who is representing the class is in somewhat of an adverse position to the lawyer in the sense that they want lawyer fees down and results up. And I've always thought that was a good protection. In this case, there was not that situation. It was just a lawyer and two of his friends, and the two friends were being paid some money. And I don't think there's any showing that I found out that there was any adversarial position. Does that in some way infect the ultimate result? That is, if the structure itself is set up differently, that it doesn't protect all the necessary parties. Does that some way affect the actual outcome of the system, of the case? Your Honor, it troubles us as well, and it's troubled us from day one. But let me explain to you why it should not infect this Court's review of Judge Hamilton's decision. Mr. Campbell was a close personal friend of plaintiff's counsel. That issue was fully examined in discovery. That issue was fully litigated to class certification. And Judge Hamilton, as objector's counsel noted, disagreed with us and concluded that that wasn't a reason because she had perceived class counsel's work and the work of the named plaintiff. She reviewed the deposition testimony, and again, she concluded under Rule 23A4 that that was not a reason to find the named plaintiff's inadequate. I should also mention there was a second named plaintiff, Mr. Hurley, in this case, where you didn't have that personal relationship issue that you had with Mr. Campbell. But putting all of that together, again, Judge Hamilton has lived with this case, had lived with this case for three full years, was presented with these arguments, again, distinguishing every single case they cite. This was fully litigated through class certification. All of the examples they cite, Coby, Pampers, Walgreens, all of those cases involved pre-certification. In many of the cases, there was a settlement reached just mere days after the case had been filed. So we would respectfully submit, although it troubles us, although we agree with some of the questions that this was in some ways an extortionate lawsuit, should never have been brought, my client was subjected to three years of litigation and faced a B-2 class and faced attorney's fees under a fee-shifting statute that were continuing to rise. The fourth day, and there were four mediations between two respected mediators, the fourth day was devoted solely to attorney's fees. And there was an intense negotiation even at that stage. That's why the counsel took a less than half of their actual lodestar. But, again, there's a fee-shifting statute here. My client faced not only the prospect of potential liability under these statutes, but also the potential for a full request for attorney's fees. You know, let me, your time is limited. What concerns me here, and I have the benefit of, unlike Judge Hamilton, who had to sit and deal with this case for years, and I understand her motivation to close it up on whatever grounds was necessary, and I understand mediators are designed to get resolution no matter what it takes. But the potential for abuse in class actions is apparent. I don't know that this is the worst example. Because as I look at this, and I'll just jump to the bottom line, I don't think the absent class members got anything useful. I also don't think they gave up anything. And so I wind up focusing on, well, attorney's fees. What is it that justified plaintiff's attorneys of getting up to close to $4 million in fees and costs for what they accomplished on behalf of the class? And if I look at it as kind of a wash, they didn't give the class anything meaningful. The class didn't lose anything either. That's why I use the term extortion, and I understand that your client likely felt like it was the victim. I understand the decision by Facebook to close this off. I'm not surprised that attorney's fees became a big part of the mediation. But if you take a step back, the concern has to be, and I'm not trying to talk about Facebook here, at what point is permitting this process to go forward this way opening the door to a risk that somebody's motivated to buy off an attorney, either because the absent class members might really lose something, or because they don't want the attorney to get motivated enough to find more viable claims that might actually result in a judgment someday. Now, I don't know, I've taken it out of the context of this case, but I think that expresses the concern that I have and lots of judges have about a class action settlement process that results in something that looks like what we have in front of us here today. Is there anything at all that you have to say to that or that we can do about that? Your Honor, and I see my time is up, I'll try to be as brief as I can. I've taken up all your time with my question. But we want to hear the answer. Thank you, because this is a very, very important issue, not just for my client, but for all of my clients, for my firm and for all the defense lawyers out there. It is a huge problem. It's a problem that our Supreme Court, every single justice has written about it, either in dissent or in joining the majority, the sort of interim effect that it's referred to as when a class action is brought. We sometimes refer to it as a thermonuclear event when a class is certified. It places significant settlement pressure on our clients. But the reason why you shouldn't be concerned with this is because this Court, and it's largely ignored in the papers, but this Court has told district judges, here are the factors that you need to consider. We refer to them as the Hanlon factors, eight factors that you need to examine to make sure the settlement is fair, reasonable, and adequate. And the settlement here was completely divorced from the attorney's fees. Judge Hamilton could have awarded $0, and plaintiff's counsel would have had no basis to withdraw from the settlement or to challenge the settlement. This settlement would have gone forward. And the settlement itself here is fair and reasonable because, as you noted, maybe someone will say, we disagree that the so-called 22 words are meaningless. We hear all the time that disclosures are buried in dense legal documents and no one can understand them. Here, we think it's a virtue that in plain English, on a website that in six months leading up to the settlement was visited by 300,000 class members. We dispute that it's 1% because we don't know how many is actually in the class. But then to get to your point on attorney's fees, this Court has then since said, since Hanlon said, where you have these warning signs, and this is in the blue tooth case, where you have these warning signs of potential collusion, district courts, you need to take an especially acute look at this settlement and be particularly vigilant for the risk of potential collusion. And Judge Hamilton did that here. But in balancing the factors, because there was nothing given up from a monetary basis, and because the statute at issue here does have a fee-shifting provision, there was going to be a request for fees. Unless we prevailed at summary judgment, which we had great confidence we would, but we had great confidence at the motion to dismiss. There was no guarantee. And so it was ultimately the product of compromise, but at no point did the class suffer in any way from that negotiation, nor does the settlement itself rise or fall based on the attorney's fees. If I look at the particulars of this case, the agreement reached through mediation set an upper bound on the attorney's fees. And the concern that I have at that point is that there's really no incentive for the district court, particularly who would be happy to see this case leave her docket, to get into that. If Facebook has acknowledged it must be worth it to Facebook to let fees up to that amount be paid just so you don't have to deal with this case anymore, why would a district court probe deeply into it when it runs the risk of not getting it off her docket? Well, Your Honor, there's also two other factors that were briefed and are in the record. You had three total of these messaging cases. Two had been pending before Judge Koh. There was one against Google for its Gmail product and one against Yahoo Mail. And the Google case was a little bit different because it settled very early. The fees in that particular case were about $2 million. In the Yahoo Mail case, which had been litigated about as long as ours, the fees were actually higher than this. This is the only one, as I understand it, where there's been an appeal of an objection. But those two benchmarks were out there for her as well. And she specifically noted on the record that in her up-to-that-point 17 years on the bench, she usually required more detail than plaintiff's counsel had submitted here. But she found that the summaries were sufficient and she placed great stock in the fact that it was less than half of their ultimate low start. She had known how much had been litigated in front of her, so she had a sense that this wasn't turning out to be the bonanza for plaintiff's counsel that some cases  are. I mean, the outside, some of the indices of abuse were not here and she knew that. And so I'm not really trying to fault her individual treatment of this. But looking at the dynamics, there's lots of reasons why a district court, not Judge Hamilton, but a district court would be thrilled to wave goodbye to litigation of this kind at whatever price. And so it comes back again. Facebook makes its decision here. In another case, it starts to take on the look of extortion. And there's a risk of that, the more that the courts generally approve these kinds of settlements and payments. So I'm not really trying to speak about what has happened in this case. Do you think that's what was upsetting the Seventh Circuit in Subway? I think it absolutely was. And, you know, again, Judge Hamilton noted at least three different occasions on the record that she found it very hard to see what actual harm there was. But when we presented that argument in the motion to dismiss, respectfully, she rejected it. And so we're in the position, we share all the concerns that you're raising, Judge Clifton. We wish that more of these cases were thrown out at the beginning. Until that happens, you're going to have clients like myself that are like But they can't die on that hill. They're a public company. They have responsibilities. They have to manage the cases as best they can, make reasoned judgments when it comes time to see if there's a settlement, and make that decision. I know Objectors' principal mission or the organization of Objectors' principal mission has been to strive at exactly that. They tell us, stop paying these plaintiffs and the cases will go away. Wish it were that simple. Do you think this case had more merit than the Subway case? I mean, it's hard for me to figure out what an appellate court is supposed to do if you think like we're being part of an extortion. Well, to be clear, I don't think that. But the Seventh Circuit and the Ninth Circuit view these issues very differently. Whereas, and actually there was a dissent in, I think it might have been the Walgreens, it wasn't in the Subway case, where the dissenting judge said the fact that this is a weak case, the fact that this shouldn't have been brought, should be considered in weighing the settlement and weighing what the class is giving up and what they're receiving. That's handling factor number one in this circuit. So that's how this circuit has decided it. We are not aware of any authority where this Court sua sponte says this case is meritless, it shouldn't have been brought, you should just remand it with instructions to dismiss, which is essentially what happened in Subway. To answer your question, I don't think this case should have ever been brought. But Judge Hamilton disagreed with me and she let it go forward and she disagreed with me again at class certification in letting the B-2 settlement go forward when we were telling her the practice is ceased, there's nothing to achieve here. And yet, even after that, we had another full year of root canal discovery of requests, you know, extensive motions practice that we largely won in narrowing it to the three practices that are addressed in the settlement. And I guess I'm way, way over my time. We actually disagree that there's not declaratory relief. The declaratory relief here is in the form of declaring historically what happened and what ceased. And I don't want to leave this podium with acknowledging or agreeing with plaintiff's counsel that that is not a form of declaratory relief. It shouldn't be limited to declaring a winner or loser. Thank you very much. Thank you, counsel. The facts in Subway were too good for the panel to pass up. That's right. So we let them have extra time. So let's start, let's put five minutes on your clock, please. Thank you, Your Honor. There's a lot of points floating about there. So I want to hit on some specifics. Your Honor, Judge Clifton seems concerned about this idea of what do we do about the problem? I think Subway is the solution. You can't allow cases to be certified at a point where it is known that they're not trying to provide an active benefit to class members. That's a 23A4 problem. But as the objector here, I mean, how is the, it's just such a puzzle. How is the absent class member better off with nothing from the settlement or with nothing from the case getting dismissed? It seems like it's sort of the same. Because they haven't released anything. If it was an individual release, then we wouldn't be here, like we said before. We wouldn't even have standing to be here. But obviously, the fact that Facebook wanted that in there means that it was of some value to Facebook. They can't, under COBE, be asked to give up anything of value. I think Subway is very clear that it's not about, it's a separate question, what you're striving to get and what you're releasing. Subway had almost no release. It was a more limited injunctive release than this because it didn't include some of the, it didn't go through the effective date of the appeal for sure. And yet, the decisive fact was that they weren't attempting to get anything of settlement for absent class members. And so the duty of adequate representation is continuing and ongoing. Part of the problem in Subway is I think the court thought they weren't ever trying to get anything ever. Like the case had no theory. Right. So this is a theme that recurs in their papers. And you heard it at argument, the idea that this was hard fought. It was post-certification. And the handling factors go right into that. But those arguments go to the adequacy of the relief in total. They go to the number, the $3.89 million. Right. Those factors show that that number is reasonable because it was hard fought. And we're not challenging that that was the right number to settle the absent class members' claims. We're challenging the allocation of that $3.89 million. Right. So the idea that we heard from plaintiff's counsel that the idea that they laid the groundwork for future suits, that's not plausible reading of the settlement, which specifically says, we cited a couple of points, the idea that Facebook denies the allegations in the second amended complaint. That's written right into the settlement, ER-127. At ER-135, they stipulate that any proceedings taken pursuant to the settlement are not and should not in any event be offered, received, or construed as evidence of a presumption, a concession, or an admission by any party of liability. That's written right into the settlement. That's ER-135. And it was a clear error of law for the district court to find that there was a declaratory relief in the settlement. It was also a clear error of law if you look at, to find that they essentially received all that they were asking for. That, well, maybe that's an error of fact because if you look at the complaint, they're not asking for a 22-word disclosure, right? These are about the scanning and interception data handling practices. Even the second amended complaint. Didn't the district court just mean that the practices stopped? It may have meant that. We don't disagree with the idea that there was no ongoing violation, but the district court didn't follow that through to its conclusion. If you think there's no ongoing violation, you can't certify a B-2 class. That doesn't make any sense. I mean, I'm not even sure you have standing for an injunction at that point. Right. So the whole thing is just so. Exactly. You shouldn't have a B-2 class at that point. Final injunctive relief is not appropriate with respect to any members of the class, let alone the classes. But then it just gets us back to the case should have been dismissed. Be certified at that point if that's the finding of the district court. That's right. If you find that, you can't proceed on a class-wide basis when you make findings of that nature. That's what subway was about in our view. And that's what happened on subway ultimately. The plaintiffs dismissed it. So if your honors were to reject the settlement, the plaintiffs would have the option of either trying to provide something of relief or conceding they couldn't provide any class-wide relief beyond what the status quo was. And then they would have to dismiss their class complaint. And that's the way these things should proceed under Rule 23 in our view. Of course, you have a little bit of a problem on our standard review, which you've agreed is our standard abuse of discretion, which is a high standard. Why do you feel that the district judge abused her discretion? By certifying the class or by approving the settlement? I think there were several errors of law. Yeah. Okay. The defense counsel said today that the district court applied Bluetooth. The district court didn't apply Bluetooth. It said, I don't have to apply Bluetooth because this is a B-2 settlement, which we don't think that logically makes any sense. Bluetooth speaks in terms of settlements in which there's a disproportionate relief going to plaintiff's counsel or settlements in which the class obtains no monetary relief, which is what we're in here. The district court also made an error of law as a notice, which I've spoken about before on my initial presentation. The district court also made an error of law by not applying COBE correctly. It considered the benefits of the litigation, not just the benefits of the settlement in its analysis. It's very clear, several points in its opinion, that it did that. Thank you, counsel. Thank you, all parties, for the helpful arguments. The case is submitted, and we're adjourned for the week.
judges: Wallace, Clifton, Friedland